37 N.J. Super. 284 (1955)
117 A.2d 196
GRAYBAR ELECTRIC CO., INC., A CORPORATION, PLAINTIFF,
v.
MANUFACTURERS CASUALTY CO., A CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF,
v.
BOARD OF EDUCATION OF THE CITY OF PLAINFIELD, A MUNICIPAL CORPORATION, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided September 30, 1955.
*285 Messrs. Furst, Furst & Feldman, attorneys for plaintiff (Mr. Louis Kraemer appearing).
*286 Messrs. Mead, Gleeson, Hansen & Pantages, attorneys for third-party plaintiff.
Mr. Frank H. Blatz, attorney for defendant.
WAUGH, J.C.C.
On May 21, 1953 Nathan R. Epstein, trading as N.R. Epstein Electric Company, hereinafter called Epstein, and the defendant Board of Education of the City of Plainfield, hereinafter called the board of education, entered into a contract by which Epstein was to do certain work on the electrical system of a certain school (Evergreen) in the City of Plainfield for the sum of $43,940.
The contract, Exhibit A, provides in Article 3 thereof, that the specifications, also Exhibit A, shall form a part of the contract between the parties.
The specifications provide, among other things, as follows:

"Payments

The Owner will make monthly payments to the contractor based on ninety percent (90%) of the estimated contract cost of completed work at the end of each month, as certified by the Engineer.
Payment of retained percentage will be made sixty (60) days after final date of acceptance."

"LIENS, STOP-PAYMENT NOTICES, AND CLAIMS

Neither the final payment or any part of the retained percentage shall become due until the contractor, if required, shall deliver to the Owner a complete release of all liens or stop-payment notices for claims arising out of this contract, or receipts in full in lieu thereof or if requested a complete release from all parties who furnished labor or material or both under this contract, and if required in either case, an affidavit that so far as he has knowledge or information, the release of receipts include all the labor and material, for which a lien or stop-notice could be filed but if any sub-contractor refuses to furnish a release or receipt in full, the contractor may if agreeable to the Owner, furnish a satisfactory bond to the Owner to indemnify him against any claims by lien or otherwise. All costs to the Owner in connection with liens, stop payment notices, claims of sub-contractors, material dealers, etc., shall be paid by the Contractor or his bond, including any reasonable legal expenses in connection with such liens, claims, stop notices, or legal proceedings arising therefrom, should such be required.
*287 The Owner reserves the right to withhold on account of subsequently discovered evidence, the whole or part of any monthly payment to such extent as may be necessary to protect against loss on account of defective work not remedied or any form of payment claims against the contractor that may subsequently have accrued."

"FINAL ACCEPTANCE

The final acceptance shall not be binding or conclusive upon the Owner should it subsequently develop that the contractor has supplied inferior material or workmanship or has departed from the terms of his contract. Should such a condition appear the Owner shall have the right, notwithstanding, final acceptance and payment to cause the work to be properly done in accordance with the drawings and specifications at the cost and expense of the contractor or his bond."
The plaintiff herein, Manufacturers Casualty Insurance Company, hereinafter called Manufacturers, issued its bond No. 501349 in the amount of $43,940 to defendant board of education. The bond is issued in accordance with the Municipal Mechanics Lien Law, N.J.S. 2A:44-125 et seq., and especially section 2A:44-143. The bond, which has Epstein as principal, is in the statutory form required by section 2A:44-147.
Epstein completed its work on the job and submitted its invoice (Exhibit B) No. 2906, dated October 7, 1953, to the board, bearing the notation, "All work completed as per plans and specifications." The bill was a final one in amount $6,225.50. The invoice was approved by Vogelbach and Bowman, consulting engineers for the project.
The board of education, at its November 17, 1953 meeting, approved the payment to Epstein (Exhibit C). Thereupon voucher No. 1136, dated November 5, 1953, was delivered. The minutes are silent as to whether or not the board accepted the job or approved the payment as a final one.
On April 7, 1954 the board received a letter from the attorneys for Graybar Electric Co., Inc., a sub-contractor of Epstein, making inquiry as to acceptance of the work.
On May 4, 1954 Epstein filed a voluntary petition and was adjudicated a bankrupt. The board passed the following resolution on June 7, 1954:
*288 "Upon motion of Messrs. Sandford and Kinsey, the following resolution made necessary by the bankruptcy of the contractor, was approved:
WHEREAS, the N.R. Epstein Electric Company substantially completed a contract for electrical work in the Evergreen School in October, 1953, and
WHEREAS, final payment of the contract price was approved by the Board of Education on November 17, 1953, now therefore, be it
RESOLVED, that the work covered by the said contract dated May 21, 1953, be and hereby is accepted as completed by the Board of Education."
Graybar thereupon sued the Manufacturers Casualty Insurance Company for $14,273.32 on the surety bond. Manufacturers Casualty Insurance Company joined the board of education as third-party defendant. The suit between Graybar and Manufacturers was settled by payment to Graybar, and the action between Manufacturers, as plaintiff, and the board of education, as defendant, was by agreement submitted for decision on stipulation of fact.
The plaintiff (Manufacturers) claims that by reason of the failure of defendant (board of education) to retain 10% of the contract price for 60 days after final date of acceptance, plaintiff was deprived of the use of the sum of $4,394 which could have been applied to the reduction of the Graybar claim.
Plaintiff argues that prepayment of the 10% was a violation of the contract between Epstein and the board of education, and that, under the following cases, the provision for the retention of 10% is as much for the benefit of plaintiff surety as for the protection of the board of education. Ft. Worth Independent School District v. Aetna Casualty & Surety Co., 48 F.2d 1, 77 A.L.R. 222 (5 Cir., 1931); Jersey City Water Supply Co. v. Metropolitan Construction Co., 76 N.J.L. 419 (Sup. Ct. 1908). It argues further that the moneys held by the board of education constituted a trust, and that plaintiff had an equitable interest in the fund, citing National Surety Corporation v. Barth, 11 N.J. 506 (1953) and Bankers Title & Abstract Co. v. Ferber Co., 15 N.J. 433 (1954). It urges the right of exoneration or indemnification by the board.
*289 Plaintiff argues further that the actual date of acceptance as required by N.J.S. 2A:44-145 before action may be brought against the surety, is immaterial in this case since the money was disbursed within a few days after November 17, 1953, the earliest possible date of acceptance, and the disbursement was in violation of the contract which required that the 10% be held for 60 days.
Defendant urges that the acceptance required by N.J.S. 2A:44-145 was made on November 17, 1953 and since no claim was made against plaintiff within 80 days, as required by that section, plaintiff had a perfect defense to Graybar's claim.
The legislative purpose of N.J.S. 2A:44-145 was to protect the rights of the public body "by requiring that no step shall be taken by materialmen or laborers, looking to the enforcement against the surety of their claims * * * until after the building or improvement has been accepted by such public agency." Thus the claims of materialmen and laborers are not paid by the surety without regard to the rights of the public body. Franklin Lumber Co. v. Globe Indemnity Co., 102 N.J.L. 9, at pages 12, 13 (Sup. Ct. 1925); affirmed 102 N.J.L. 715 (E. & A. 1926).
Without doubt, the "acceptance" used in the contract and specifications here under consideration means the date of acceptance used in the statute, N.J.S. 2A:44-145, and were that date material, it would have to be determined in accordance with the statute and the cases construing it. Paul H. Jaehnig, Inc., v. Standard Accident Insurance Co., 18 N.J. Super. 536, at page 540 (Cty. Ct. 1952), cases collected.
This court concludes that the defendant is not liable to the plaintiff, what ever the date of final acceptance, and it therefore becomes unnecessary to determine the date of final acceptance.
Plaintiff would be entitled to exoneration if any funds were left in the hands of the defendant board of education. Unfortunately, there are no funds left. In the case of Stulz-Sickles Co. v. Fredburn Construction Corporation, *290 114 N.J. Eq. 475, at page 477 (Ch. 1933), Vice-Chancellor Berry stated:
"The right of exoneration is merely a right to have the fund applied to the payment of the guaranteed claims. [Citing cases.] Admittedly the surety is entitled to exoneration and the fund is clearly charged with an equity in favor of the surety to the extent that it be applied to the payment of the laborers, materialmen, and subcontractors." (Italics by this court.)
The Stulz-Sickles case is authority for the proposition that unpaid funds "in the hands of a municipality, representing the balance of the contract price of a public improvement, where the contractor was in default, constituted a trust fund for the benefit of all parties."
Unpaid portions of public funds for a housing project were held to be trust funds in National Surety Corporation v. Barth, supra, and unpaid portions of the price of a contract for constructing a shopping center were disposed of among various claimants in an interpleader action in Bankers Title & Abstract Co. v. Ferber Co., supra.
Plaintiff may proceed against the funds paid to Epstein since, by virtue of N.J.S. 2A:44-148, the money paid him constitutes a trust fund. Epstein may be guilty of a violation of N.J.S. 2A:102-12, making it a misdemeanor to use the money received for a purpose other than the payment of claims for materials, labor and other charges.
Neither will subrogation avail anything for the plaintiff. For the plaintiff would step into the shoes of Epstein and may recover only if Epstein could. Standard Accident Insurance Co. v. Pellecchia, 15 N.J. 162, at page 172 (1954). See also Guise v. John C. Guise, Inc., 112 N.J. Eq. 11 (Ch. 1932). Epstein was a party to the alleged breach of the contract, and Epstein has no right of action against the board. In any event, Epstein and Graybar could recover only to the extent of any balance in the hands of the public agency. See N.J.S. 2A:44-128, the last paragraph of which section reads as follows:
*291 "No public agency shall be required to pay a greater amount than the contract price of the labor performed and materials furnished or the value thereof when no specific contract is made with respect to the same by the contractor or subcontractor, respectively."
The plaintiff relies strongly upon the case of Ft. Worth Independent School District v. Aetna Casualty & Surety Co., supra, a case in which a surety brought suit against a school district for its wrongful release of funds to the surety's principal. The court in holding for the surety said, 48 F.2d, at page 4:
"It is well settled that a stipulation in a building contract that a percentage of the price shall be retained until the final completion and acceptance of the work, is as much for the benefit of the surety as for the protection of the owner, and a failure to comply therewith releases the former in so far as the rights of the latter are concerned."
Plaintiff also cites National Surety Co. v. County Board of Education, 15 F.2d, 993 (4 Cir., 1926), and Jersey City Water Supply Co. v. Metropolitan Construction Co., supra, and Meyer v. Standard Accident Insurance Co., 114 N.J.L. 483 (E. & A. 1934), as authority to the same effect.
In the last cited case, our Court of Errors and Appeals said, 114 N.J.L., at page 490:
"`It is a general principle that any material alteration in a building contract will release nonconsenting sureties upon a bond given to guarantee the faithful performance of the contract, and to protect the owner against any claims or liens for labor or materials used in the construction of the building. Whether a payment made by the owner before it has become due, or in an amount larger than provided for in the contract, is such a material alteration of the contract as to release the sureties, is a question upon which the decisions do not agree; but the great weight of authority seems to be that such payments will release the sureties, the argument being not only that the sureties are entitled to have the amounts reserved in the contract applied to the satisfaction of possible liens or claims against the building, but also that the fact that there are earned, but unpaid, moneys in the hands of the owner, will act as an incentive to the contractor to execute his contract in a faithful manner.' Case note, 5 L.R.A., N.S., 418. See, also, Welch v. Hubschmitt Building & Woodworking Co., 61 N.J.L. 57.
*292 The reservation of a portion of the contract price until the completion of the building is not only for the benefit of the owner, but also for the benefit of the surety. Prairie State National Bank [of Chicago] v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412."
But we are here dealing with a statutory form of bond, not present in the cited cases. The last paragraph of the form of bond required by N.J.S. 2A:44-147 reads:
"`The said surety hereby stipulates and agrees that no modifications, omissions or additions in or to the terms of the said contract or in or to the plans or specifications therefor shall in anywise affect the obligation of said surety on its bond.'"
That form evidences a legislative intent to make the bonding company absolutely liable for the penal sum of the bond no matter what alteration, omission or addition the board and the contractor may make in or to the terms of the contract.
The board of education in this case omitted to retain the 10% to determine if there were unpaid claims, or to require a special bond for double the amount due under section 2A:44-130. These omissions are clearly covered within the terms of the bond.
There is nothing in the stipulation of facts to indicate that the payment to Epstein was the result of bad faith on the part of the board. A similar fact of prepayment was before the court in the case of Fidelity & Deposit Co. of Maryland v. Storr, 115 N.J. Eq. 150, at pages 156, 157 (E. & A. 1934), wherein, it appears that certain sums were paid prior to their due date under contract upon recommendation of the engineers. The point raised here was not argued in that case. It is to noted that the payment to Epstein was made upon recommendation of the engineers.
In the case of Jersey City Water Co. v. Metropolitan Construction Co., supra, the clause of the contract allowing modification or alteration was clearly limited to the performance of the work and furnishing of materials.
In Ft. Worth Independent School District v. Aetna Casualty & Surety Co., supra, the board paid the contractor *293 $35,000 in violation of a retained percentage provision of the contract. It sought to justify this under the provision of the bond which reads as follows:
"And provided, that any alterations which may be made in the terms of the Contract, or in the work to be done under it, or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the surety or sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived." [48 F.2d 3.]
This provision was held not to authorize any substantial change in the contract, and was "intended to prevent alterations `in the terms of the contract or in the work,' or because of `extensions of time or other forbearance on the part of either the owner or the principal' from operating as a `release * * * of the surety * * * from liability' under the bond; any such `extension or forbearance being hereby waived.'" The court there held that the quoted provision of the bond had "no other reasonable object than to protect the school district against acts of the contractor, such as the failure to complete, or abandonment of the work requiring outlays on the part of the owner, notwithstanding any forbearance toward him by it."
The case of Meyer v. Standard Accident Insurance Co., supra, did not involve this statutory form of bond.
In this case, the contract and bond must be considered in the light of the whole statutory scheme. The right of creditors to any lien whatever is statutory. John B. Grover v. Board of Education of the Township of Franklin, 102 N.J. Eq. 415, at page 422 (Ch. 1928); Fidelity & Deposit Co. of Maryland v. McClintic Marshall Corporation, 115 N.J. Eq. 470 (Ch. 1934), affirmed 117 N.J. Eq. 440 (E. & A. 1934), and by statute the lien is given only on the funds remaining in the hands of the board, N.J.S. 2A:44-128; the primary purpose of the bond has repeatedly been held to be for the protection of the public board, *294 Franklin Lumber Co. v. Globe Indemnity Co., supra; the form of bond required by N.J.S. 2A:44-147 clearly binds the surety despite "`omissions or additions in or to the terms of the said contract.'" All these things taken together evidence a purpose to favor the public body.
This court comes to the conclusion that the plaintiff is not entitled, under the law as it presently exists, to exonerate subrogation or damages for breach of contract.
There will be a judgment for the defendant, but without costs.